# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| KRISTINE MILEY , | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| *versus* | § | CIVIL ACTION NO. 3:13-566 |
| | § | |
| CAROLYN W. COLVIN, | § | |
| Acting Commissioner of | § | |
| Social Security, | § | |
| | § | |
| *Defendant.* | § | |

## REPORT AND RECOMMENDATION

Kristine Miley ("Miley") seeks review of an adverse decision on her application for disability-based supplemental security income benefits under the Social Security Act.[1]

## I. Judicial Review

A reviewing court's limited role under 42 U.S.C. § 405(g) is to determine whether (a) the Commissioner applied proper legal standards and (b) the decision is supported by substantial evidence. *See Lamay v. Commissioner of Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009), *cert. denied*, 559 U.S. 962 (2010); *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see also* 42 U.S.C. § 405(g). Courts cannot retry factual issues *de novo* or substitute their interpretations of

---

[1]     Supplemental Security Income benefits, available under Title XVI of the Social Security Act (42 U.S.C. § 1382c) assure that disabled individuals' incomes do not fall below the poverty line. *See* Online Social Security Handbook, available at http://www.socialsecurity.gov/policy/docs/ssb/v54n8/v54n8p2.pdf (last visited September 5, 2014).

administrative records for that of the Commissioner when substantial evidence supports the decision. *Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998). Neither can they overturn administrative rulings because they would have reached a different conclusion had the matter come before them in the first instance. *See Campbell v. Astrue*, 465 Fed. App'x 4, 5 (2d Cir. 2012) (summary order).

## II. Background

Miley, born in 1981 and morbidly obese (5 '2" and 330 lbs. in 2012), has a tragic personal history.[2] She applied for benefits due to post-traumatic stress disorder ("PTSD"), depression, stomach problems, leg problems, and intestinal problems commencing May 30, 2007. (T. 100).[3] An evidentiary hearing was held before an administrative law judge, John P. Ramos ("ALJ Ramos"). (T. 15, 282-315). Miley, represented by counsel,[4] attended and testified. (*Id.*).

---

[2] Miley was abused as a child, and raped at age 13. (T. 198, 237 253). She completed 11 years of school in a regular education classroom. (T. 237). She has been involved in multiple motor vehicle accidents, including one involving head trauma when hit by a van while riding a bicycle in 1997. (*Id.*). In 2004, during a storm, she suffered head trauma again when a trash can flying in the air because of wind hit her. (*Id.*). In 2006, Child Protective Services investigated abuse by her "ex" who had "rage" issues. (T. 238). When CPS visited, her house was a mess; the children had no beds; there was raw sewage in the house as well as black mold. (T. 239). Her three children voluntarily went to live with their grandmother from 2006-2008. (*Id.*) Although Miley might have regained custody of her children, she did not because she felt physically "too ill to do so." (*Id.*). Instead, her kids live with their father and she pays child support. (*Id.*). In mid-2000, she was raped by a man she was allowing to live in her house. In 2009, she was living with Fred Miley and became pregnant, but lost her baby at 40 weeks. (T. 136, 254). She married Fred in 2010 and became pregnant again, having a baby in 2011. (T. 136, 208).

[3] "T." followed by a number refers to the page of the administrative record. (Dkt. No. 9).

[4] Initially, Miley was not represented by counsel; thus, ALJ Ramos adjourned the hearing to allow her to obtain representation. (T. 259-69). After obtaining counsel, a second hearing commenced, but it was adjourned in order to obtain complete medical records. (T. 270-81).

ALJ Ramos denied Miley's application in a written decision dated October 23, 2012. (T. 15-24). Miley requested Appeals Council review. After considering Miley's objections and additional evidence (consisting of treatment notes of Scott Rosman, CNP, dated September 14, 2012), the Appeals Council denied Miley's request to review. (T. 6-9). Miley then instituted this proceeding.

## III.  Commissioner's Decision

Utilizing a five-step sequential evaluation procedure prescribed by regulation and approved by courts as a fair and just way to determine disability applications in conformity with the Social Security Act,[5] ALJ Ramos found that Miley suffers from severe impairments consisting of morbid obesity, PTSD, anxiety disorder, and depressive disorder. (T. 15). [6] He considered none of these impairments presumptively disabling under 20 C.F.R. Pt. 404, Subpt. P, App. 1 (the "Listings").[7] ALJ Ramos next determined that Miley retains residual functional capacity to perform simple, low-stress, consistent, repetitive tasks

---

[5]     The procedure is "sequential" in the sense that when a decision can be reached at an early step, remaining steps are not considered. *See* 20 C.F.R. § 416.920; *Bowen v. Yuckert*, 482 U.S. 137, 153 (1987) (citing *Heckler v. Campbell*, 461 U.S. 458, 461 (1983)). A full discussion of the Commissioner's five-step process is contained in *Christiana v. Commissioner of Soc. Sec. Admin.*, No. 1:05-CV-932, 2008 WL 759076, at *1-2 (N.D.N.Y. Mar. 19, 2008).

[6]     Miley also made allegations of body odor, leg pain, back pain, stomach pain, headaches, nausea, numbness, and dizziness, which ALJ Ramos declined to as severe impairments.  (T. 18). Miley complains regarding ALJ Ramos's Step 2 findings are set forth, *infra*.

[7]     The Commissioner publishes a series of listed impairments describing a variety of physical and mental conditions, indexed according to the body system affected.  20 C.F.R. Pt. 404, Subpt. P, App. 1 (the "Listings").  Listed impairments are presumptively disabling. *See* 20 C.F.R. §§ 416.920(a)(4)(iii), (d).

with supervision at the sedentary exertional level that do not require managing or supervising others' work.[8]  (T. 19).

Miley has no past relevant work.  Thus, ALJ Ramos consulted the Medical–Vocational Guidelines, commonly referred to as "the grids," to determine if there is any available work that a person with Miley's residual functional capacity can perform.  (T. 23-24).  He concluded that a finding of "not disabled" was appropriate under the framework of Rule 201.24 and SSR 85-15.[9]  Miley's application, therefore, was denied.  (T. 24).

## IV.  Points of Alleged Error

Miley's brief presents four points of error, as follows :

1.  ALJ errs in failing to determine the functional limitations associated with headaches and strong body odor and in failing to find that they constitute a severe condition;

2.  ALJ's RFC to impairments created by Plaintiff's mental illness is erroneously understated;

3.  ALJ's credibility determination is not proper; and

---

[8]    ALJ Ramos's complete residual functional capacity assessment is as follows:

> [T]he undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 416.967(a) and she retains the ability to understand and follow simple instructions and directions; perform simple tasks with supervision and independently; maintain attention and concentration for simple tasks; regularly attend to a routine and maintain a schedule; relate to and interact appropriately with others to the extent necessary to carry out simple tasks; and handle reasonable levels of simple, repetitive work-related stress, in that she can make decisions directly related to the performance of simple tasks in a position with consistent job duties that does not require the claimant to supervise or manage the work of others.

(T. 19-20).

[9]    SSR 85-15, TITLES II AND XVI: CAPABILITY TO DO OTHER WORK – THE MEDICAL-VOCATIONAL RULES AS A FRAMEWORK FOR EVALUATING SOLELY NONEXERTIONAL IMPAIRMENTS, 1985 WL 56857 (SSA 1985).

4.     Episodic inability to work requires the production of a vocational expert to determine the erosion of the job base.

(Dkt. No. 19, p. 2).

In response, the Commissioner argues that ALJ Ramos employed correct legal principles and his factual findings are supported by substantial evidence. (Dkt. No. 15, pp. 5-23).

## V.  Step 2 Severity Determination

While ALJ Ramos agreed that Miley has severe impairments (listed above), he declined to find her body odor, leg pain, back pain, stomach pain, headaches, nausea, numbness, and dizziness as severe impairments.[10]  Miley complains that ALJ Ramos erred in failing to find that her *headaches* and *strong body odor* constitute severe conditions.  (Dkt. No. 19, p. 7).  Miley maintains that her body odor limits employment opportunities and, accordingly, must be assessed as a severe impairment.  (*Id.*, p. 8).  She further contends that her headaches must be assessed both as a severe condition and in terms of their episodic limiting effect upon employment.  (*Id.*).

---

[10]     ALJ Ramos articulated this finding as follows:

With regard to headaches, the claimant underwent testing that resulted in no conclusive findings.  She has described them as "intermittent" and recently she has been asymptomatic.  With regard to the other issues, the record only has subjective complaints.  There is very little treatment and there is no evidence that any of the issue objectively cause limitations.  In fact, the claimant herself asked why she was being sent to a physical examination, noting that her impairments are mental.  At the mental examination, she stated that she was "in very good health and has few health problems."  Nevertheless, even if the claimant is experiencing any minor limitation, it is more than accounted for by the sedentary residual functional capacity found below.

(T. 18) (exhibit references omitted).

*A.    Governing Principles*

Existence and severity of impairments are determined at Step 2 of the sequential evaluation process (described earlier in note 5). "Impairments" are "anatomical, physiological, or psychological abnormalities . . . demonstrable by medically acceptable clinical and laboratory techniques."[11] Severe impairments significantly limit an individual's physical or mental ability to do basic work activities.[12]

In this Circuit, a Step 2 severity inquiry serves only to "screen out *de minimis* claims." *Dixon v. Shalala*, 54 F.3d 1019, 1030 (2d Cir. 1995). Consequently, "[a] finding of 'not severe' should be made if the medical evidence establishes only a 'slight abnormality' . . . [with] . . .'no more than a minimal effect on an individual's ability to work.'" *Rosario v. Apfel*, No. 97 CV 5759, 1999 WL 294727, at *5 (E.D.N.Y. Mar. 19, 1999) (quoting *Bowen v. Yuckert*, 482 U.S. 137, 154 n. 12 (1987)).

*B.    Application*

    1.    <u>Body Odor</u>

Miley's assertions that her strong body odor has "cost her jobs" and "diminishes her ability to work with others," may be accurate. Such repulsive condition, however, does not constitute a severe impairment unless it is an impairment within the specialized meaning of the Social Security Act. Miley has not been diagnosed by a physician as having an anatomical, physiological or psychological abnormality that produces body odor. Only one progress note from

---

[11]    *See* 42 U.S.C. § 1382c(a)(3)(D); 20 C.F.R. § 404.1508.

[12]    *See* 20 C.F.R. § 416.920(c); *see also* SSR 85-28, Titles II and XVI: Medical Impairments That Are Not Severe, 1985 WL 56856, at *3-4 (SSA 1985).

a physician's assistant, Joseph Brunt, P.A. ("PA Brunt"), even records a strong body odor. (T. 216-17). PA Brunt, however, did not diagnose a medical condition related to Miley's odor; rather, he observed and noted that Miley appeared disheveled, suggestive of inadequate personal grooming, not an impairment demonstrable by diagnostic techniques. (T. 216). PA Brunt did not mention any effect on Miley's ability to work attributable to odor (*e.g.*, a limitation in working around others). In all other medical visits with medical sources, Miley's body odor went unnoticed and unrecorded.

"[T]he test for disability is not whether an individual can actually get hired for a job, but whether he or she has the physical and mental capacity to adequately perform one." *Glassman v. Sullivan*, 901 F.2d 1472, 1474 (8th Cir. 1990). Instead of being a "physical impairment," body odor is a "condition that impairs . . . ability to *get* a job, not one that impairs . . . ability to *perform* one." (*Id*.) (body odor not a disability within the meaning of the Act) (emphasis added). Because Miley's body odor problem does not impair her ability to *perform* work, it cannot contribute to disability in the social security context. ALJ Ramos, therefore, did not err in failing to find Miley's body odor to be a severe impairment.

2.    Headaches

Undoubtedly, headaches can be symptomatic of abnormalities demonstrable by medically acceptable clinical and laboratory techniques.[13] No such evidence, however, exists in Miley's case. Medical progress notes in

_____

[13]    Anatomical, physiological and psychological diseases may cause headaches. *See* Headache Symptoms: Causes, available at, http://www.mayoclinic.org/symptoms/headache/basics/causes/sym-20050800 (last visited September 5, 2014). Miley's treating source sought to determine whether medically-demonstrable abnormalities in her neck, brain and heart were a source of Miley's headaches.

February, 2012, record Miley as stating that she experienced headaches intermittently, but was then asymptomatic. (T. 216). Miley had a battery of tests run (*e.g.,* computerized tomography ("CT") scan of her neck, magnetic resonance imaging ("MRI") of her brain, and an echocardiogram of her heart). She was referred to a neurologist, Dr. Taseer Minhas, M.D., for treatment. (T. 218, 219, 220-22). Despite such testing, the cause of her headaches was not determined. (T. 309).

Dr. Minhas prescribed Miley medication to address Miley's headaches, and planned to increase the dosage gradually. (T. 226). Miley, however, stopped taking the medication, and she never followed up with Dr. Minhas. (T. 308-09). The fact that Miley did not avail herself of all opportunities to mitigate the alleged severity of her headaches undermines her allegations that she suffers from a bothersome level of headaches.[14] (T. 308-09).

During a separate consultative examination, Miley did not mention headaches as an impairment. Rather, she stated that she was "in very good health" except for transient gastrointestinal issues. (T. 172). No medical source opined that Miley's headaches affect her ability to work.

ALJ Ramos's Step 2 assessment that Miley's headaches do not rise to the level of a severe impairment is consistent with both the medical evidence and

---

[14]    *See* 20 C.F.R. § 416.930(b) ("If you do not follow the prescribed treatment without a good reason, we will not find you disabled."); *see also* SSR 96-7p, TITLES II AND XVI: EVALUATION OF SYMPTOMS IN DISABILITY CLAIMS: ASSESSING THE CREDIBILITY OF AN INDIVIDUAL'S STATEMENTS, 1996 WL 374186, at *7 (SSA July 2, 1996) (claimant's statements "may be less credible if the level or frequency of treatment is inconsistent with the level of complaints, or if the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure"); *Prue v. Commissioner of Soc. Sec.,* Civil Action No. 2:13-cv-13, 2014 WL 37669, at *7 (D. Vt. Jan. 6, 2014) ("ALJ did not err in considering whether [claimant] sought treatment and complied with treatment recommendations in an effort to mitigate the effects of her [impairment]").

Miley's own testimony. Accordingly, ALJ Ramos's exclusion of headaches from the list of severe impairments at Step 2 was not error.

## VI. Residual Functional Capacity

Miley's second and third points of error both challenge ALJ Ramos's crucial finding of "residual functional capacity." This administrative term refers to what persons can still do in work settings despite physical and/or mental limitations caused by their impairments and related symptoms, such as pain.[15] Administrative law judges decide whether applicants, notwithstanding their impairments, have physical and mental abilities to perform activities generally required by competitive, remunerative work on a regular and continuing basis.[16] Descriptions and observations of limitations from all sources, medical, claimants and lay persons are admissible and relevant on this issue.[17]

### A.  Episodic Inability to Work

Miley does not quarrel with ALJ Ramos's assessment that she can perform work activities at the sedentary exertional level. (Dkt. No. 19, p. 3). Rather, her second point argues that ALJ Ramos's assessment is flawed because it does not account for her "episodic inability to work." (Dkt. No. 19, pp. 8-11). Miley asserts that medical evidence establishes that her headaches and other mental limitations preclude her from working even at the sedentary level on a regular

---

[15]    *See* 20 C.F.R. § 416.945(a)(1); *see also* SSR 96-8p, TITLES II AND XVI: ASSESSING RESIDUAL FUNCTIONAL CAPACITY IN INITIAL CLAIMS, 1996 WL 374184, at *2 (SSA July 2, 1996).

[16]    "A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-8p, TITLES II AND XVI: ASSESSING RESIDUAL FUNCTIONAL CAPACITY IN INITIAL CLAIMS, 1996 WL 374184, at *2 (SSA July 2, 1996).

[17]    *See* 20 C.F.R. § 416.945(a)(3).

and continuing basis, and that ALJ Ramos's residual functional capacity assessment erroneously does not account for this limitation. (*Id*.).

## 1.   Governing Legal Principles

Administrative law judges must consider all impairments and their resulting limitations when assessing residual functional capacity.[18] When evaluating residual functional capacity, a governing regulation requires that adjudicators consider "the quality and level of your overall functional performance, *any episodic limitations*, the amount of supervision or assistance you require, and the settings in which you are able to function."[19]

## 2.   Medical Evidence

Medical evidence concerning Miley's mental capacity came from four primary sources whose names, roles and opinions are listed and summarized in the note below.[20] Among these, Dr. Lattimore did not opine as to whether

---

[18]     *See* 20 C.F.R. §§ 416.920(e), 416.945(c); SSR 96-8p, TITLES II AND XVI: ASSESSING RESIDUAL FUNCTIONAL CAPACITY IN INITIAL CLAIMS, 1996 WL 374184, at *5 (SSA July 2, 1996).

[19]     *See* 20 C.F.R. § 416.920a(c)(2)(emphasis added).

[20]     <u>Dr. Kenneth Lattimore, M.D.</u> (treating psychiatrist in 2010 and 2011):

Dr. Lattimore opined that Miley's affect was bright and appropriate; she was fully oriented; she displayed no evidence of thought disorder; she reported no hallucinations, delusions, or suicidal thoughts; her attention, concentration, and memory were described as "adequate," "good," "fair," and "normal." (T. 158-62). Although she was stressed in September and December 2010, she advised it was related to owing child support to her children's father and a bench warrant being issued for her arrest. (T. 159, 167). Despite this stress, her attention, memory and concentration were noted to be within normal limits. (*Id.*). Thereafter, in March 2011, Dr. Lattimore noted that Miley reported her moods had been fairly stable and she slept and ate reasonably well; she hoped she was pregnant. (T. 212). While receiving treatment from Dr. Lattimore, Miley was prescribed Zoloft. (T. 158-62, 167).

Dr. Lattimore never assessed that Miley had any work-related limitations.

<u>Dr. Kay Gendron, Ph.D.</u> (state agency consultative examiner):

Dr. Gendron performed a mental status examination in December 2010. (T. 168-73). On this particular day, Miley was described as a "garrulous, extremely loud individual," who was unable to compose herself and engaged in
(continued...)

Miley's mental impairments produce work-related limitations, but he did observe that she was "stressed" in 2010 when an arrest warrant emanating from her

disruptive behavior in the waiting room before the appointment. (T. 168). Dr. Gendron's notes describe Miley as depressed and hypomanic. (T. 170). She noted Miley's speech flow was highly pressured and she went from laughter to tears throughout the interview. (*Id.*). Miley's thought contact was noted as erratic. Dr. Gendron diagnosed Miley with mild to moderate depressive disorder and personality disorder, NOS, with aspects of borderline and dependent personality disorders. (T. 172). Dr. Gendron opined that Miley has marked limitations in her ability to make judgments on simple work-related decisions, respond to work pressures in a usual work setting, and respond appropriately to changes in a routine work setting. (T. 174).

Dr. Paul Taren, Ph.D. (state agency reviewing psychologist):

After reviewing Miley's longitudinal medical record, Dr. Taren opined in a January 2011 Psychiatric Review Technique form that Miley had mild functional limitations in activities of daily living; mild functional limitations in maintaining social functioning; moderate functional limitations in maintaining concentration, persistence, or pace; and no repeated episodes of decompensation, each of extended duration. (T. 186). Dr. Taren further found in a Mental Residual Functional Capacity Assessment that Miley was moderately limited in her ability to carry out detailed instructions; her ability to maintain attention and concentration for extended periods; and her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number of rest periods. (T. 190-91).

Dr. Taren opined that Miley is able to maintain regular attendance and be punctual; does not require special supervision in order to sustain a work routine; and "is able to carry out simple, routine tasks despite the limitations resulting from her impairments." (T. 192).

Dr. Mary Ann Moore, Psy.D. (consultative examiner for Broome County)

Dr. Moore examined Miley in April 2012, for the county Department of Social Services. She completed a Psychological and Intellectual Assessment for Determination of Employability. (T. 237-43). At the time of her examination, Miley was not taking Zoloft or any other psychotropic medication. (T. 245). Dr. Moore noted Miley's appearance as somewhat unkempt; her speech was pressured; her thought process was normal; her mood was dysthymic; her affect was anxious and depressed; her orientation was normal; her attention and concentration were normal; her recent and remote memory skills were impaired; her cognitive functioning was low average to borderline range; her insight was fair; and her judgment appeared fair. (T. 239). Testing of Miley's intelligence revealed low average intelligence but no learning disabilities. (T. 246-47). Dr. Moore assessed Miley with a Global Assessment of Functioning rating of 57. (T. 248). She opined that Miley had "normal functioning" in the areas of following, understanding and remembering simple instructions and directions; using public transportation; and handling low stress and simple tasks. (*Id.*). She found Miley had "moderately limited" functioning in the areas of performing complex tasks independently; maintaining attention and concentration for rote tasks; regularly attending to a routine and maintaining a schedule; maintaining basic standards of hygiene and grooming. (*Id.*).

Dr. Moore opined that Miley could work up to 40 hours a week with the following accommodations: "low stress work activities which are slow paced and repetitive in nature. No multi-tasking is recommended." (T. 248-49).

failure to pay child support was outstanding. Remaining medical sources all observed work-related functional limitations stemming from Miley's mental impairments. Nevertheless, Dr. Taren (whose opinions ALJ Ramos afforded "significant weight") and Dr. Moore (whose opinions ALJ Ramos gave "some weight") both opined that, notwithstanding such functional limitations, Miley could work a normal work week doing simple, unskilled and low-stress jobs. (T. 192, 248-49).

Consultative examiner, Dr. Gendron, after noting that Miley engaged in both disruptive behavior in the waiting room before her appointment and highly volatile and labile expressions during examination, concluded that Miley has more limiting restrictions. (T. 168, 171). She opined that Miley exhibited erratic thought contact, and has marked limitations in her ability to make judgments on simple work-related decisions, respond to work pressures in a usual work setting, and respond appropriately to changes in a routine work setting. (T. 174).

ALJ Ramos afforded Dr. Gendron's opinion *very little* weight, noting that it was "quite inconsistent" with all of the other evidence in the record, and that Miley had never been psychiatrically hospitalized.[21] (T. 22). ALJ Ramos reasoned that Miley may have been affected by situational stressors on the day of her consultative examination, but "it is an outlier and not at all consistent with the evidence of record." (*Id.*).

---

[21] ALJ Ramos also recited that Miley's GAF score denoted nothing more than moderate symptoms or difficulties. (T. 21-22). Moreover, treatment notes (albeit sporadic) described her as "bright" and "appropriate." (*Id.*).

3.   Discussion and Application

Given (a) Dr.  Lattimore's observation that Miley became stressed in September and December, 2010, due to legal problems, (b) Dr. Gendron's experience with Miley's disruptive conduct and other abnormal behavior in December, 2010, and (c) Dr. Taren's and Dr. Moore's concurrences that Miley's mental state generates workplace limitations, ALJ Ramos might reasonably have concluded – as Miley now advocates – that she experiences episodic inability to work.  The question for a reviewing court, however, is not whether there was evidence supporting Miley's view.  Rather, the question is whether substantial evidence supports ALJ Ramos's finding of residual functional capacity.

Both Dr. Taren and Dr. Moore opined that Miley can function in simple, unskilled, low-stress jobs on a regular and continuing basis, *i.e.*, a normal 40 hour work week.  Both are credible medical sources on whose opinions ALJ Ramos reasonably could rely.  ALJ Ramos also reasonably could reject Dr. Gendron's opinion of marked mental limitations in a work setting for the reasons he stated, and also because Miley never exhibited episodic mental dysfunction during examination and treatment by other medical sources or during her three appearances before ALJ Ramos.  Although Miley can point to other evidence in the record that may support a contrary finding, it does not negate substantial evidence supporting ALJ Ramos's residual functional capacity assessment.

Here, the evidentiary record may support more than one position.  In such cases, the Commissioner's determination controls.  *See Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002) ("Genuine conflicts in the medical evidence are for the Commissioner to resolve.").  There is no reversible error, therefore, in ALJ

Ramos's omission of an episodic-inability-to-work-limitation into his residual functional capacity assessment.

## B.    *Rejection of Subjective Evidence*

Miley alleged inability to work due to back pain that radiates to her right leg, weakness, passing out, obesity, body odor, stomach pain, depression, PTSD, and anxiety.   (T. 100, 107-114, 121-27, 244).   She provided self-evaluations of the intensity, persistence and limiting effects of these alleged impairments and associated symptoms in an initial "Function Report" completed on October 19, 2010,[22] an updated "Disability Report" dated April 2, 2011,[23] and testimony at the administrative evidentiary hearing in October, 2012.[24]   Collectively, this evidence, were it accepted as fully credible, would establish virtual physical invalidity and also mental deficits consisting of depression and/or panic attacks

---

[22]    Miley described herself as needing assistance from her husband to bathe, shave, cook, clean, go out, and care for pets. (T. 108-110).   Since her baby died in childbirth in February, she feels like she does not deserve anything good; she cries and feels sad. (T. 109, 114).   She worries about so many things she cannot focus.   (T. 114).   She is terrified of driving because she has been in numerous motor vehicle accidents.   (T. 110).   She can go to friends' houses if someone gives her a ride;  she can read books, write poetry, and play board games.   (T. 111).    She can do her own budget, pay bills, count change, handle a savings account, use a check book/money orders, and use public transportation. (T. 108, 110).   She describes herself as "very friendly to everyone."  (T. 112).

[23]    Miley updated her condition as being pregnant.   (T. 121).    She claimed that she cannot stand or sit for long periods of time and that everything she described before is the same.   (*Id.*).   She states, "I can take care of myself, but with tremendous pain." (*Id.*).    Regarding her personal needs, she again states, "I can pretty much take care of myself, but my husband helps me in the shower because I get light headed because I have to reach above my head when shampooing hair, and my main thing is I can do things for myself but have to keep alternating sitting and standing due to intense pain daily and often." (T. 125).

[24]    Miley testified that she was able to take care of her then almost 11-month old baby.   (T. 289).   She takes care of the his diapers, bottles, and tending to him in the night.   (T. 291).   In exchange, her husband does the cleaning.   (*Id.*).   She attempts to cook every night, but sometimes has to sit or ask for help stirring.   (T. 292).   She tries to be the one that does the shopping; when she goes to Wal-Mart, she uses an electric chair.   (*Id.*).   She further testified that gets panic attacks and becomes light-headed.   (T. 297). Also, when she becomes nervous, the stress brings on headaches.   (T. 298).

that make her feel sad, nervous, "light-headed" and brings on headaches, crying, and difficulty focusing.

In conjunction with a lengthy discussion of the evidence of record, ALJ Ramos made the following credibility determination:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the objective evidence of record . . . .  The claimant's credibility is weakened by her lack of work history.  Her de minimus [*sic*] earnings demonstrate little or no attachment to the labor market.
>
> * * *
>
> The claimant has made significant exertional allegations.  However, the objective evidence of record does not fully support them. . . .
>
> * * *
>
> The claimant has also made significant nonexertional allegations. However, the objective evidence of record does not fully support them either. . . .
>
> * * *
>
> In addition to the objective evidence, the claimant spends time with family, cooks, watches television, attends appointments, uses public transportation, helps care for her kids, maintains most of her personal care, cleans, shops, sits on her porch, manages money, reads and writes poetry.  She spends time with friends on a regular basis and plays board games.  She describes herself as "friendly."  The claimant stated that she gets along "okay" with authority figures and she has never been fired or laid off from a job because of problems getting along with others.
>
> * * *
>
> In sum, the above residual functional capacity is supported by clinical findings, activities of daily living and the opinion of psychologist [Dr.] Taren.

(T. 20-21, 23) (exhibit citations omitted).

1. <u>Miley's Challenge</u>

In her third point of error, Miley claims that ALJ Ramos improperly discounted her subjective credibility by picking and choosing only evidence consistent with his finding. (Dkt. No. 19, pp. 11-13). Miley relies on several Second Circuit and within-circuit district court cases invalidating subjective credibility determinations based on distorted or misread evidence in order to make a claimant appear to lack credibility.[25] (*Id.*).

2. <u>Analysis</u>

The best-informed (sometimes only) source of information regarding intensity, persistence and limiting effects of pain and other potentially disabling symptoms is the person who suffers therefrom. Testimony from claimants, therefore, is not only relevant, but desirable. On the other hand, such testimony is subjective and may be colored by interest in obtaining a favorable outcome. Hence, subjective symptomatology by itself cannot be the basis for a finding of disability. A claimant must, in addition, present medical evidence or findings that the existence of an underlying condition could reasonably be expected to produce the symptoms alleged.[26]

---

[25]    *See Genier v. Astrue*, 606 F.3d 46, 50 (2d Cir. 2010) ("Because the ALJ's adverse credibility finding, which was crucial to his rejection of Genier's claim, was based on a misreading of the evidence, it did not comply with the ALJ's obligation to consider 'all of the relevant medical and other evidence,' 20 C.F.R. § 404.1545(a)(3), and cannot stand."); *Horan v. Astrue*, 350 Fed. App'x 483, 484 (2d Cir. 2009) (summary order) ("ALJ's credibility finding is not supported by substantial evidence and is the product of legal error. The ALJ's adverse credibility determination was based in part on testimony that Horan did not give and an inconsistency that did not exist."); *Smith v. Apfel*, 69 F. Supp.2d 370,380 (N.D.N.Y. 1999) ("ALJ's decision to reject plaintiff's subjective claims is not supported by substantial evidence.").

[26]    *See* 42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. § 416.929; SSR 96-7p, Titles II and XVI: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements, 1996 WL 374186, at *2 (SSA July 2, 1996); SSR 96-4p, Titles II and XVI: Symptoms, Medically Determinable Physical and Mental Impairments, and Exertional and Nonexertional Limitations, 61 Fed. Reg. 34488-01, 34489, 1996 WL 362210 (SSA July 2, 1996).

Miley's argument that ALJ Ramos improperly discredited her subjective evidence has initial appeal. First, ALJ Ramos used tired and essentially meaningless boilerplate to articulate his credibility choice ("claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the objective evidence of record"). Second, using Miley's lack of prior employment earnings as evidence of malingering is, at best, thin.[27] Third, and for the reasons articulated in Miley's brief, ALJ Ramos's rendition of her daily activities is quite skewed. (Dkt. No. 19, pp. 12-13).

The Commissioner's brief, on the other hand, recites obvious and good reasons for rejecting Miley's subjective testimony. (Dkt. No. 15, pp. 18-20). Miley's self-evaluation of disabling effects of her symptoms was inconsistent with objective medical evidence in some important respects. As ALJ Ramos noted, Miley has full range of motion of her arms, shoulders, elbow, wrists, hand, neck, hips, and knees; she uses no assistive device and has received minimal treatment. (T. 21, 228). Additionally, treatment notes describe her as bright with intact attention, concentration, and memory; she has never had any

---

[27]    An administrative law judge considers prior work history when evaluating a claimant's credibility. *See* 20 C.F.R. § 416.929(c)(3); *see also* SSR 96-7p, TITLES II AND XVI: EVALUATION OF SYMPTOMS IN DISABILITY CLAIMS: ASSESSING THE CREDIBILITY OF AN INDIVIDUAL'S STATEMENTS, 1996 WL 374186, at *5 (SSA July 2, 1996). In this regard, the Second Circuit has observed:

> Logically, poor work history could support one of two conclusions. . . . [A] poor work history might also support an inference that a claimant's testimony of disability is truthful. A claimant's failure to work might stem from her inability to work as easily as her unwillingness to work.

*Schaal v. Apfel*, 134 F.3d 496, 502 (2d Cir. 1998).

hospitalizations. (T. 21, 158-62, 212-13). And, as ALJ Ramos correctly noted, Dr. Moore and Dr. Taren indicated she was capable of working with certain accommodations.

Miley's subjective evidence was self-contradictory in some respects. While her initial Functional Report indicated that she needed her husband's assistance for many activities, her subsequent Disability Report stated she was able to do most things, albeit with pain.[28] Similarly, she testified to being able to do certain activities, although it may take longer, without her husband present.

Nothing in social security jurisprudence is more firmly established than that it is the prerogative of the Commissioner, not reviewing courts, to resolve evidentiary conflicts and to appraise credibility of witnesses, including the claimant. *Aponte v. Secretary, Dep't of Health & Human Servs.,* 728 F.2d 588, 591 (2d Cir. 1984).[29] Consequently, reviewing courts are loathe to second-guess and overturn credibility choices made by administrative adjudicators. Given that ALJ Ramos's credibility choices were not patently unreasonable under the evidence described above, a reviewing court should decline to overturn them, even though some of his articulated reasons were anaemic and his methodology unworthy of judicial imprimatur.

---

[28] It is unreasonable to assume that ALJ Ramos gave no consideration to these inconsistencies. "An ALJ's failure to cite specific evidence does not indicate that such evidence was not considered." *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998); *see also Brault v. Social Sec. Admin. Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) ("An ALJ does not have to state on the record every reason justifying a decision," nor is an administrative law judge "required to discuss every piece of evidence submitted.").

[29] *See also Pietrunti v. Director, Office of Workers' Comp. Programs*, 119 F.3d 1035, 1042 (2d Cir. 1997) ("Credibility findings of an ALJ are entitled to great deference and therefore can be reversed only if they are 'patently unreasonable.'"); *Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010) ("Normally, [the court] give[s] an ALJ's credibility determinations special deference because the ALJ is in the best position to see and hear the witness.").

Under unique circumstances of this case, moreover, declaring error would be of academic interest only. Since Miley *concedes* that she retains physical residual capacity for work activities at the sedentary exertional level, ALJ Ramos's supposed error in rejecting Miley's subjective testimony concerning her *physical* infirmities did not prejudice her. This narrows the inquiry to whether ALJ Ramos's credibility determination disadvantaged Miley with respect to the *mental* residual functional capacity determination.

Miley's sole complaint in this respect relates to ALJ Ramos's omission of an episodic-inability-to-work-limitation into his residual functional capacity assessment. Miley's subjective evidence is not directly relevant to that proffered limitation. And, as determined in Section VI.*A*.3, *supra*, substantial medical-source evidence supports ALJ Ramos's finding that Miley can perform a limited range of sedentary work on a regular and continuing basis. Thus, absent the supposed error in assessing subjective credibility, the result would not change.

In this circumstance, careful judicial review discloses no reversible error.

## VII. Step 5 Determination

At Step 5 of sequential evaluation, the Commissioner determines whether "there is work in the national economy that the claimant can do." *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009); *see also DeChirico v. Callahan*, 134 F.3d 1177, 1180 (2d Cir. 1998); *Berry*, 675 F.2d at 467; 20 C.F.R. § 416.966. Generally, administrative law judges elicit or consult expert vocational testimony or officially-published data to determine when a claimant's residual work skills can be used in other work and specific occupations in which they can be used.

In some circumstances, however, adjudicators may take administrative notice of disability *vel non* by adopting and applying findings published in the "Medical–Vocational Guidelines" commonly called "the grids." *See Roma v. Astrue*, 468 Fed. App'x 16, 20–21 (2d Cir. 2012) (summary order); *Bapp v. Bowen*, 802 F.2d 601, 604 (2d Cir. 1986); *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 2.[30] When only *exertional* impairments are in play, and an administrative law judge's findings of residual functional capacity, age, education, and previous work experience coincide with grids parameters, the Commissioner may directly apply the grids to determine whether work exists in the national economy which claimants can perform.[31]  But, when claimants suffer from *nonexertional* impairments[32] (solely or in addition to exertional impairments), administrative law judges may consult and utilize the grids only as a "framework" for

---

[30]    The Medical Vocational Guidelines ("grids") are a matrix of general findings established by rule as to whether work exists in the national economy that a person can perform. When properly applied, they ultimately yield a decision of "disabled" or "not disabled." *Zorilla v. Chater*, 915 F. Supp. 662, 667 & n. 2 (S.D.N.Y. 1996).

[31]    *See Martin v. Astrue*, 337 Fed. App'x 87, 91 (2d Cir. 2009) (summary order); *Thompson v. Barnhart*, 75 Fed. App'x 842, 844 (2d Cir. 2003) (summary order) (Commissioner can meet Step 5 burden "by resorting to the applicable medical-vocational guidelines (the grids)"); *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 2.

[32]    A nonexertional impairment is "[a]ny impairment which does not directly affect [the strength demands of work such as] the ability to sit, stand, walk, lift, carry, push, or pull. This includes impairments which affect the mind, vision, hearing, speech, and use of the body to climb, balance, stoop, kneel, crouch, crawl, reach, handle, and use of the fingers for fine activities." SSR 83-10, TITLES II AND XVI: DETERMINING CAPABILITY TO DO OTHER WORK THE MEDICAL VOCATIONAL RULES OF APPENDIX 2, 1983 WL 31251, at *6 (SSA 1983).  Examples of nonexertional limitations are as follows: nervousness, anxiety, and depression; inability to maintain attention or concentrate; difficulty understanding or remembering detailed instructions; difficulties with sight or hearing; difficulty tolerating some physical feature(s) of certain work settings, *e.g.*, inability to tolerate dust or fumes; and difficulty performing manipulative or postural functions of some work such as reaching, handling, stooping, climbing, crawling, or crouching. *See* 20 C.F.R. § 416.969a(c)(1)(i)(vi).

evaluating whether nonexertional impairments result in disability.[33] Framework analysis involves (a) consulting the grids with respect to the available occupational base given a claimant's exertional capacity, age, education, work experience and transferability of skills, and (b) determining how much that individual's occupational base is further eroded or diminished by nonexertional limitations and/or environmental restrictions.[34]

## A.    Miley's Challenge

Miley argues that ALJ Ramos erred in relying on the grids because her "episodic inability to work requires production of a vocational expert to determine the erosion of the job base." (Dkt. No. 19, pp. 13-15).   Miley claims that ALJ Ramos failed to properly assess the episodic limitations on inability to work when headaches strike; has not properly assessed the limited job base due to inability to work with others due to her body odor; or the limitations on her inability to complete a work day and work pace.  (*Id.*, p. 14)

---

[33]    *See* SSR 83-12, TITLES II AND XVI: CAPABILITY TO DO OTHER WORK – THE MEDICAL-VOCATIONAL RULES AS A FRAMEWORK FOR EVALUATING EXERTIONAL LIMITATIONS WITHIN A RANGE OF WORK OR BETWEEN RANGES OF WORK, 1983 WL 31253 (SSA 1983); SSR 83-14, TITLES II AND XVI: CAPABILITY TO DO OTHER WORK – THE MEDICAL-VOCATIONAL RULES AS A FRAMEWORK FOR EVALUATING A COMBINATION OF EXERTIONAL AND NONEXERTIONAL IMPAIRMENTS, 1983 WL 31254 (SSA 1983); SSR 85-15, TITLES II AND XVI: CAPABILITY TO DO OTHER WORK – THE MEDICAL-VOCATIONAL RULES AS A FRAMEWORK FOR EVALUATING SOLELY NONEXERTIONAL IMPAIRMENTS, 1985 WL 56857 (SSA 1985).

[34]    In *Washington v. Astrue*, No. 5:12-cv-39 (GLS), 2012 WL 6044877, at *5 (N.D.N.Y. Dec. 5, 2012), a case involving a claimant with only a nonexertional impairment, this court described framework analysis as follows:

> Where the claimant suffers solely from a nonexertional impairment, the ALJ must consider: (1) the RFC reflecting such nonexertional impairment and its limiting effects on the availability of other work; and (2) the claimant's age, education, and work experience. *See* SSR 85-15, 1985 WL 56857, at *2-3 (1985). Those medical and vocational factors must be analyzed under the framework set out in the Medical-Vocational Guidelines § 204.00. *See id.* Although "[t]he assistance of a vocational resource may be helpful" and, in some cases, necessary, SSR 85-15 does not require that the ALJ always call upon the services of a VE. *Id.* at 3.

*Id.*

*B.    Discussion*

By definition, mental impairments are nonexertional. ALJ Ramos understood that the grids did not apply directly to determine whether alternative work exists that Miley can perform. Rather, in Miley's case, the grids could only serve as "a framework for decisionmaking." (T. 23-24). ALJ Ramos did not, however, elicit testimony of either a vocational expert or other similar evidence regarding the existence of jobs in the national economy for individuals with Miley's mental impairments.

> With respect to mental impairments, SSR 85–15 states in part:
>
> The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting.

SSR 85–15, 1985 WL 56857, at *4. Importantly, this Ruling further states that the occupational base for such work is severely eroded *only when a claimant has a substantial loss of ability to meet any of these basic demands. Id.* (emphasis added).

ALJ Ramos found that Miley is able to follow simple instructions and directions; perform simple tasks with both supervision and independently; maintain attention and/or concentration for simple tasks; regularly attend to a routine; maintain a schedule; relate and interact appropriately with others to the extent necessary to carry out simple tasks; and handle reasonable levels of simple, repetitive work-related stress (*i.e.*, make decisions directly related to the performance of simple tasks with consistent job duties that do no require the claimant to supervise or manage the work of others). (T. 19-20). These findings mirror the Ruling's parameters of mental capacity for unskilled sedentary work. ALJ Ramos was entitled to rely on the Ruling's administratively-noticed fact

that the occupational base is not severely eroded for a person with such mental capacities.

Therefore, substantial evidence supports ALJ Ramos's finding that Miley's nonexertional mental impairments do not significantly reduce her occupational base, and the grids provided a framework for deciding that Miley's mental impairments are not disabling.[35]

## VIII.  Recommendation

Miley's request to remand this action should be DENIED. The Commissioner's decision should be AFFIRMED.

## IX.  Objections

Parties have fourteen (14) days to file specific, written objections to the Report and Recommendation.  Such objections shall be filed with the Clerk of the Court.

**FAILURE TO OBJECT TO THE REPORT, OR TO REQUEST AN EXTENSION OF TIME TO FILE OBJECTIONS, WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**

*Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Graham v. City of New York*, 443 Fed. App'x 657, 658 (2d Cir. 2011) (summary order); *FDIC v. Hillcrest Assocs.*, 66 F.3d 566, 569 (2d Cir. 1995); *see also* 28 U.S.C. § 636(b)(1), Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil Procedure, and NDNY Local Rule 72.1(c).

Signed on the ___8___ day of ___September___ 2014.

*Earl S. Hines*

Earl S. Hines
United States Magistrate Judge

---

[35]     A different conclusion might be warranted had ALJ Ramos erred (as advocated by Miley) by failing to factor episodic or intermittent ability to work into Miley's residual functional capacity assessment.  But, as determined above in Sections V and VI, *supra*, ALJ Ramos did not err in that respect.